Robert C. Ekstrand (N.C. State Bar No. 26673
  *Pro Hac Vice Application Pending*
EKSTRAND & EKSTRAND LLP
110 Swift Avenue, Second Floor
Durham, North Carolina 27705
Telephone: 919-416-4590
Facsimile: 919-214-3014
E-mail: rce@ninthstreetlaw.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
*for the*
DISTRICT OF ARIZONA

| | |
|---|---|
| COURTNEY CONNOR,<br><br>  Plaintiff,<br><br>vs.<br><br>ARIZONA STATE UNIVERSITY AND ARIZONA BOARD OF REGENTS,<br><br>  Defendants | Case No.: 2:21-CV-_____<br><br>**COMPLAINT** |

THE PLAINTIFF, COURTNEY CONNOR, for her complaint against Arizona State University and the Arizona Board of Regents, alleges upon information and belief the following:

### THE PARTIES

1. Plaintiff, Courtney Connor, is a citizen and resident of Arizona.

2. Defendant Arizona State University (ASU) is a federally funded educational institution in Maricopa County, Arizona.

COMPLAINT - 1

3. At all times applicable to this Complaint, ASU, its agents, and employees took various actions that deprived Ms. Connor of her federally protected rights. Defendants provide programs and activities receiving federal financial assistance acting under the color of state and federal law. ASU, a non-jural entity controlled and administered by Defendant Arizona Board of Regents ("ABOR"), appears here in name only for frame of reference as the conduct complained of herein was engaged in by employees of ASU, and the claims asserted against ASU are directed at it through ABOR in this suit as stated below.

4. At all times relevant, Defendant, Arizona Board of Regents, (hereinafter "ABOR") is a body corporate of the State of Arizona, created by statute and having jurisdiction and control over public universities in the State of Arizona including ASU. ABOR has the capacity to sue and be sued pursuant to A.R.S. §15-1625(B). ABOR was, during the relevant time, Ms. Connor's "employer" as that term is used in 42 U.S.C. §2000e(b) and operates an "education program or activity receiving Federal financial assistance" as that phrase is used in 20 U.S.C §1681(a).

5. Ms. Connor has exhausted her administrative remedies with respect to her Title VII claims by virtue of having filed charges of discrimination and retaliation with the United States Equal Employment Opportunity Commission and commencing this action within ninety days of receipt of her Notice of Suit Rights.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under federal law, including Title VII of the Civil Rights Act of 1964 ("Title VII"), Title IX of the Education Amendments of 1972 ("Title IX") and 28 U.S.C. § 1367(a) confers supplemental jurisdiction over Ms. Connor's state law claims.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts and omissions giving rise to Ms. Connor's claims occurred in this District.

8. Ms. Connor has exhausted her administrative remedies with respect to her Title VII claims by virtue of having filed a charge of discrimination and retaliation with the United States Equal Employment Opportunity Commission and commencing this action within ninety days of receipt of her Notice of Suit Rights.

## GENERAL ALLEGATIONS

9. On November 14, 2015, ASU hired Ms. Connor to create and build its women's lacrosse program from scratch.

10. At the time ASU hired Ms. Connor, ASU had no women's lacrosse program and Ms. Connor was a nationally recognized leader in women's lacrosse.

11. As a women's lacrosse player, Ms. Connor was a five-time Division I NCAA national champion and a member of the U.S. National Team.

12. As a head coach, Ms. Connor had 12 years of experience during which Ms. Connor led two nationally recognized NCAA programs — Mount St. Mary's University and the University of Maryland at Baltimore — to the most successful period in the history of their respective programs. She won her conference's Coach of the Year award at both schools. Her teams won their institution's first conference championships and first NCAA Tournament appearances in program history. Her players became All-Americans and won all-conference and academic all-conference recognition.

13. Ms. Connor had also embarked on a wildly successful broadcasting career as a women's lacrosse analyst and a men's lacrosse sideline reporter for ESPN, the Big Ten Network, and Inside Lacrosse. She was being recognized as the

COMPLAINT - 3

face and voice of women's lacrosse broadcasts. Then ASU called to ask Ms. Connor to create a women's lacrosse program at ASU.

14. ASU had decided to create a women's lacrosse program in part to remedy its failure to comply with Title IX's requirement of gender equity in its athletics program.

15. ASU induced Ms. Connor to leave her successful broadcasting career by promising her that the women's program would be supported by the University in the same way that its other athletic programs were supported.

16. ASU would not keep these promises, but, in reliance upon them, Ms. Connor accepted ASU's offer.

17. Ms. Connor's employment with ASU began in late 2015, and she was assigned to report to Senior Associate Athletics Director Scottie Graham.

18. Early in her employment, Ms. Connor was interviewed by NCAA investigators who were investigating complaints of gender inequity in ASU's athletics programs.

19. Ms. Connor answered the NCAA investigators' questions truthfully, but in many cases revealed gender inequity in the resources ASU provided to her womens' lacrosse program including but not limited to disparate allocation of budget, equipment, staff allocation, travel, facilities, staff, and salary.

20. Ms. Connor's supervisors, including Mr. Graham, made it clear to Ms. Connor that they were angered by her truthful disclosures to the NCAA investigators and, because of her truthful reports of gender inequity in violation of Title IX in ASU's athletics department, they took steps to make the gender inequities more entrenched and created a hostile work environment for Ms. Connor.

21. Ms. Connor continued to complain about the University's violations of Title IX in its athletics department and, when she was subjected to sexual

COMPLAINT - 4

harassment in violation of Title VII, she complained to the University's officials about that and the hostile work environment it created. Ms. Connor's complaints included, for example:

22.  Ms. Connor engaged in protected activity under Title VII by reporting, opposing and complaining of ASU's employment practices that she reasonably believed were unlawful employment practices prohibited under Title VII, including, for example:

   a. Ms. Connor's male supervisor's persistent sexual overtures in the workplace, including but not limited to his comment to Ms. Connor that she "makes [his] dick hard";

   b. Ms. Connor's male supervisor's persistent sexual comments to Ms. Connor about his sexual arousal and gratification from seeing her and other female employees in the ASU athletic department wearing form-fitting clothing, citing particular body parts of Ms. Connor's female colleagues;

   c. The University's Athletics Director's and Ms. Connor's male supervisor's approval of, participation in, and ratification of the severe, pervasive sexual harassment (sexual touching, comments, and propositioning) engaged in by Mr. Ware; including their requirement that Ms. Connor appear in the suites at athletic events that Mr. Ware would be in attendance so that he could gratify his sexual desires with her and subject her to further sexual harassment and sexual assault;

   d. Gross disparities between the resources the University afforded to Defendants' men's and women's athletic programs – and between male and female head coaches -- including the facilities, equipment, training, staff, travel, lodging, food, promotion and other resources that were made available to female and male coaches and teams; and

e. Responding truthfully about Defendants' failures to provide essential resources and support to her women's lacrosse program to NCAA investigators who interviewed her in connection with an NCAA investigation into Defendants' failure to meet Title IX gender equity requirements.

23. Immediately after and because of Ms. Connor's complaints of gender inequity, gender discrimination, sexual harassment, and the hostile environment engendered by it in violation of Title VII and Title IX, ASU subjected Ms. Connor to a campaign of retaliatory adverse actions, culminating in her termination without cause on or about April 29, 2019.

24. On May 3, 2019, Ms. Connor appealed and reported her termination to ASU's human resources officer as discriminatory and in retaliation against her for engaging in protected conduct.

25. ASU responded to Ms. Connor's May 3, 2029 complaint of discrimination, harassment, and retaliation in the same way it responded to her prior reports of discrimination, harassment, and retaliation: with deliberate indifference. For example:

a. The University failed to take prompt action on Ms. Connor's complaint.

b. The University failed to appropriately investigate or collect relevant evidence supporting Ms. Connor's allegations in the University's possession, custody, or control or otherwise readily available to the University.

c. The University failed to make a determination on Ms. Connor's complaint until March 5, 2020 — over 10 months after Ms. Connnor made her complaint.

    d. The University's determination amounted to little more than the conclusory assertion that "no violations of ACD 401: Prohibition on Discrimination, Harassment, and Retaliation" (the ASU policy that incorporates the prohibitions of Title VII and Title IX) occurred in connection with Ms. Connor's employment.

    e. The University's determination of "no violation" in connection with Ms. Connor's employment was contradicted by the University's prior determination that a prominent ASU athletics booster, Bart Wear, had serially sexually harassed ASU employees, their spouses, and others and Ms. Connor was one of them.

26. The Defendants' March 5, 2020 determination of Ms. Connor's complaint of retaliatory discharge was a final decision made by Defendants' employees with final policymaking authority over Ms. Connor's employment and Defendant's employees unlawful conduct. The Defendants' March 5, 2020 "determination" condoned and ratified the discrimination, harassment, and retaliation Ms. Connor was subjected to during her employment at the University, up to and including the retaliatory termination of Ms. Connor's employment.

27. Ms. Connor timely filed a complaint of discrimination and retaliation in violation of Title VII to the Equal Employment Opportunity Commission and fully participated in the EEOC's procedures until she finally received the EEOC's Notice of Suit Rights on or about October 5, 2021.

## RESPONDEAT SUPERIOR

28. All of the conduct complained of herein was engaged in by individuals acting in their capacity as employees and agents of ASU and in furtherance of ASU's interests; and such conduct was participated in, authorized, condoned, and/or ratified by ASU employees with supervisory and final policymaking

authority over the employees and their conduct. As a result, all of the conduct complained of herein is imputed to ASU and the ABOR pursuant to the doctrine of *respondeat superior*. Therefore, ASU and the ABOR are liable for all of the damages Ms. Connor suffered as a result of the conduct giving rise to the following claims.

**FIRST CAUSE OF ACTION**
Retaliation in Violation of Title VII (42 USC § 2000e, *et seq*.)
(Against All Defendants)

29. ASU and ABOR are employers as that term is used in Title VII of the Civil Rights Act of 1964, 42 USC §2000e(b).

30. Title VII prohibits retaliation against any person by discriminating, threatening, coercing, or intimidating for the purpose of interfering with any right or privilege secured by Title VII or because s/he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing concrning a report of employment practices that are made unlawful by Title VII.

31. Ms. Connor made numerous reports and complaints of unlawful employment practices that are made unlawful by Title VII to University officials, and Ms. Connor reasonably believed them to be unlawful employment practices under Title VII. As such, Ms. Connor's complaints and reports were protected conduct under Title VII.

32. Ms. Connor engaged in protected activity under Title VII by reporting, opposing and complaining of ASU's employment practices that she reasonably believed were unlawful employment practices prohibited under Title VII, including, for example:

    a. Ms. Connor's male supervisor's persistent sexual overtures in the workplace, including but not limited to his comment to Ms. Connor that she "makes [his] dick hard."

COMPLAINT - 8

    b. Ms. Connor's male supervisor's persistent sexual comments to Ms. Connor about his sexual arousal and gratification from seeing her and other female employees in the ASU athletic department wearing form-fitting clothing, citing particular body parts of Ms. Connor's female colleagues.

    c. The University's Athletics Director's and Ms. Connor's male supervisor's approval of, participation in, and ratification of the severe, pervasive sexual harassment (sexual touching, comments, and propositioning) engaged in by Mr. Ware; including their requirement that Ms. Connor appear in the suites at athletic events that Mr. Ware would be in attendance so that he could gratify his sexual desires with her and subject her to further sexual harassment and sexual assault.

33. Because of and immediately after Ms. Connor engaged in protected activity, Defendants employees began a campaign of taking adverse employment actions against Ms. Connor, which continued throughout the remainder of her employment and culminated in the approval and ratification of the retaliatory termination of Ms. Connor by Defendants' employees with final policymaking authority over the decision.

34. The Defendants ratified and condoned their employees' retaliatory conduct and retaliatory discharge in their March 5, 2020 determination that their employees' retaliatory conduct constituted no violation of Title VII or ASU's "Prohibition on Discrimination, Harassment, and Retaliation" policy (the ASU policy that incorporates the prohibitions of Title VII) occurred in connection with Ms. Connor's employment.

35. Defendants' retaliatory conduct persisted throughout Ms. Connor's remaining employment up to and including the May 5, 2020 determination in

which Defendants' employees with final policymaking authority approved, condoned, and ratified it.

36. Defendants' campaign of adverse treatment of Ms. Connor because of her protected activity and the approval and ratification of it by Defendants' senior officials is reasonably likely to deter other employees from engaging in protected activity.

37. As a proximate result of Defendants' unlawful conduct, Ms. Connor suffered and continues to suffer irreparable injury.

38. As a further proximate result of Defendant's unlawful conduct, Ms. Connor suffered damages and other compensable harms to be shown at trial, including emotional distress, past and future lost wages and benefits, the costs of bringing Defendants' unlawful conduct to the attention of Defendants' officials with final policymaking authority over the university's compliance with Title IX and Defendants' federal regulators, and the costs of bringing this action.

39. Plaintiff is therefore entitled to equitable relief and damages in an amount to be determined by a jury.

## SECOND CAUSE OF ACTION
Retaliation in Violation of Title IX (20 USC § 1681)
(Against All Defendants)

40. Plaintiff incorporates by reference all of the allegations set out in this complaint as though fully set forth here.

41. ASU and ABOR own and operate education programs receiving Federal financial assistance as that phrase is used in Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681.

42. Title IX and its implementing regulations prohibit retaliation against any person by discriminating, threatening, coercing, or intimidating for the purpose of interfering with any right or privilege secured by Title IX or because s/he has made

COMPLAINT - 10

a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing concrning a report of sex discrimination, including gender inequality, in education programs receiving Federal financial assistance. 20 U.S.C. § 1681; 34 C.F.R. § 100.7(e).

43. Ms. Connor made numerous reports and complaints of sex discrimination and gender inequality in Defendants' educational programs and activities to University officials and NCAA officials investigating complaints of gender inequities in Defendants' athletics program, including, for example:

a. Gross disparities between the resources the University afforded to Defendants' men's and women's athletic programs, including facilities, equipment, training, staff, travel, lodging, food, promotion and other resources.

b. Responding truthfully about Defendants' failures to provide essential resources and support to her women's lacrosse program to NCAA investigators who interviewed her in connection with an NCAA investigation into Defendants' failure to meet Title IX gender equity requirements.

c. Ms. Connor's male supervisor's persistent sexual overtures in the workplace, including but not limited to his comment to Ms. Connor that she "makes [his] dick hard."

d. Ms. Connor's male supervisor's persistent sexual comments to Ms. Connor about his sexual arousal and gratification from seeing her and other female employees in the ASU athletic department wearing form-fitting clothing, citing particular body parts of Ms. Connor's female colleagues.

e. The University's Athletics Director's and Ms. Connor's male supervisor's approval of, participation in, and ratification of the

> severe, pervasive sexual harassment (sexual touching, comments, and propositioning) engaged in by Mr. Ware; including their requirement that Ms. Connor appear in the suites at athletic events that Mr. Ware would be in attendance so that he could gratify his sexual desires with her and subject her to further sexual harassment and sexual assault.

44. The sex discrimination and gender inequality in Defendants' educational programs and activities that Ms. Connor reported and complained of to the Defendants constituted violations of Title IX and Ms. Connor reasonably believed them to be violations of Title IX. As such, Ms. Connor's complaints and reports were protected conduct under Title IX.

45. Immediately after and because of Ms. Connor's protected conduct, Defendants immediately began a campaign of retaliation against Ms. Connor by taking adverse actions against her.

46. Defendants' retaliatory conduct persisted throughout Ms. Connor's remaining employment up to and including the Defendants' March 5, 2020 determination of Ms. Connor's complaint of retaliation in which Defendants' employees with final policymaking authority approved, condoned, and ratified it.

47. Defendants acted intentionally in retaliating against Ms. Connor because she reported illegal sexual discrimination in the form of sexual harassment and gender inequality in the Defendants' educational programs and activities.

48. Defendants' campaign of retaliation against Ms. Connor is reasonably likely to deter other employees from engaging in protected activity.

49. As a proximate result of Defendants' unlawful conduct, Ms. Connor suffered and continues to suffer irreparable injury.

50. As a further proximate result of Defendant's unlawful conduct, Ms. Connor suffered damages and other compensable harms to be shown at trial, including emotional distress, past and future lost wages and benefits, the costs of

bringing Defendants' unlawful conduct to the attention of Defendants' officials with final policymaking authority over the university's compliance with Title IX and Defendants' federal regulators, and the costs of bringing this action.

51. Plaintiff is therefore entitled to equitable relief and damages in an amount to be determined by a jury.

### THIRD CAUSE OF ACTION
Wrongful Termination
(Against All Defendants)

52. Plaintiff incorporates by reference all of the allegations set out in this complaint as though fully set forth here.

53. The Arizona Employment Protection Act (ARS § 23-1501(A)(3)(c)) prohibits actions in retaliation for an employee's disclosure that the employee has information or reasonably believes that the employer or an employee of the employer violated or will violate a state statute or the Arizona Constitution.

54. The Arizona Civil Rights Act (ARS §§ 41-1461 – 41-1468) prohibits "an employer" from engaging in discrimination, harassment and retaliation based on sex.

55. Arizona State University is "an employer" as that term is used in the ACRA. ARS § 41-1461(7)(a).

56. The Arizona Board of Regents is "an employer" as that term is used in the ACRA. ARS § 41-1465(7)(a).

57. Ms. Connor was "an employee" of Arizona State University as that term is used in the ACRA. ARS § 41-1461(6)(a).

58. Ms. Connor was an "an employee" of the Arizona Board of Regents as that term is used in the ACRA. ARS § 41-1461(6)(a).

59. As alleged herein, Ms. Connor reported and complained of discrimination, harassment, and retaliation based on sex and gross gender

inequities in the Defendants' workplace and in the Defendants' educational programs and activities as alleged more particularly above.

60. Defendants were aware of the discrimination, harassment, retaliation, and gross gender equities reported by Ms. Connor.

61. Yet, Defendants failed and refused to promptly investigate, take any corrective action, or respond appropriately to address the discrimination, harassment, retlaliation, and gross gender inequity in Defendants' workplace and in their educational programs and activities.

62. Instead, Defendants retaliated against Ms. Connor for making her reports and complaints by waging a persistent, severe, and pervasive campaign of adverse treatment, adverse employment actions, and other retaliatory conduct.

63. Defendants likewise retaliated against another employee who, like Ms. Connor, made reports and complaints of severe and pervasive sexual harassment in Defendants' workplace and educational programs and activities. Specifically, Defendants responded to David Cohen's reports and complaints of severe and pervasive sexual harassment by placing Mr. Cohen on administrative leave, changing the terms and conditions of his employment, stripping him of benefits, and terminating him, all in violation of the ACRA. Defendants' unlawful retaliation against employees for reporting Defendants' discrimination based on sex was widespread, severe, and pervasive.

64. The wrongful termination of Ms. Connor and Defendants' ratification of it were willful and malicious.

65. As a direct and proximate result of Defendants' wrongful termination in violation of the public policy of this State, Ms. Connor has suffered damages in an amount to be determined by a jury.

66. Further, due to the willful and malicious conduct of the Defendants, Plaintiff is entitled to punitive damages in an amount to be determined by a jury.

# PRAYER FOR RELIEF

67.  Plaintiff demands entry of judgment against Defendant awarding Plaintiff:

a.  A declaration that Defendants violated Ms. Connor's rights under federal and state law;

b.  A permanent injunction restraining Defendants from acting upon or reporting their retaliatory termination of Ms. Connor or Defendants' March 5, 2020 "determination" ratifying it;

c.  All other and further appropriate equitable relief necessary to remedy Defendants' deprivation of Ms. Connor's federally protected rights;

d.  Lost past and future wages, bonuses, compensation and other employee benefits;

e.  Compensatory damages in an amount to be determined by a jury;

f.  Reasonable attorneys' fees and costs to the extent allowed by law;

g.  Pre-judgment and post-judgment interest to the extent allowed by law; and

h.  All such other and further relief at law or in equity as the Court deems proper.

Respectfully submitted on this the 3rd day of January 2022.

/s/ Robert C. Ekstrand
Robert C. Ekstrand
N.C. Bar No. 26673
***Motion for Admission Pro Hac Vice pending***
EKSTRAND & EKSTRAND LLP
110 Swift Avenue, Second Floor
Durham, North Carolina 27705
Tel. (919) 416-4590
rce@ninthstreetlaw.com
**Counsel for Plaintiff, Courtney Connor**